# EPSTEIN SACKS PLLC
ATTORNEYS AT LAW
100 LAFAYETTE STREET
SUITE 502
NEW YORK, N.Y. 10013

BENNETT M. EPSTEIN: (917) 653-7116
SARAH M. SACKS: (917) 566-6196

November 16, 2020

Hon. J. Paul Oetken
United States District Judge
Southern District of New York
US Courthouse
40 Foley Square
New York, NY 10007

**via ECF and email to OetkenNYSDChambers@nysd.uscourts.gov**

Re: *United States v. Nikolai Niftalijev*
18 Cr. 678 (JPO)

Dear Judge Oetken:

When our assigned client Nikolai Niftalijev, a struggling Estonian drug addict who could barely pay his rent, was lured into a supporting role in this fentanyl conspiracy by the promise of millions of euros and a new life in Spain, nobody could anticipate, or even in retrospect can really fathom, what a nightmare of hospitals and jails such a pipe dream would become for him. Today we ask the Court to recognize our client's near-death experience, already lengthy incarceration on two continents and biblical suffering as sufficient punishment and draw his case to a close by sentencing him to "time served." We request that the Court order his immediate release from the MCC into immigration custody and an ultimate repatriation to Estonia, where his wife, Raida, and his two children, still toddlers, await him.

The Court is by now familiar with this saga from our previous submissions seeking severance, which we respectfully incorporate here by reference. However, a brief chronology at this point may be helpful.

Niftalijev first met with the undercover "CS," whom we have previously referred to as "the Columbian" and more senior members of the conspiracy-in-progress in mid-February of 2018.

Niftalijev's "expertise," which is hardly the right term, was as a fentanyl addict on the streets of Tallinn who knew - not as a chemist but as a user - how to dilute the drug. When it became clear that the only way even the more "sophisticated" members of this bunch of amateurs could obtain fentanyl in quantity was to take shots in the dark buying it on the internet, attempting to order it from supposed Chinese suppliers who were mostly charlatans, Niftalijev's role was that of a go-fer who was sent to post offices to retrieve what turned out to be empty boxes or fake drugs. Meanwhile, some of the others higher up in the hierarchy, who (unlike Niftalijev) spoke English, communicated with the CS to offer excuses for their inability to supply him and ask (or beg, even) for more money because they did not have enough for living expenses. After several months of this, a quantity of drugs was finally obtained and Niftalijev helped dilute it, using sugar, and was tasked to carry samples to a car trunk in Copenhagen.

That was on or about May 9, 2018. On May 31, 2018, on the cusp of a larger delivery, he was poisoned and left for dead at a campsite in the Danish woods after a falling out with some of his co-conspirators. Found by a caretaker who summoned an ambulance, he lay comatose and near death for approximately ten days, connected to every medical apparatus imaginable, at Roskilde Hospital. The chart from his three-week hospital stay, where he suffered multiple organ failure and underwent numerous life-saving procedures, records him writhing in pain, crying out in delirium, and requiring that he be restrained in his intensive-care bed. On June 19, 2018, he was transported to a Danish court from which he was released to be medically transferred to an Estonian hospital. There he remained until his arrest on a U.S. extradition warrant on September 4, 2018. The Estonian hospital chart records a half-dozen additional surgical procedures that were performed to reconstruct his buttocks due to the dead muscle tissue and huge bed sores that had formed around the sites where the poison had been injected, and to repair his internal organs including the insertion of a colostomy. His September 4th arrest was immediately followed by about a year of incarceration in an Estonian jail while awaiting extradition to the United States during which his Estonian lawyer unsuccessfully sought his release on bail due to inadequate medical care and inhumane conditions, noting that his client still had open wounds and was unable to sit or lie down in his cell. In lieu of bail, he was granted some extra underwear, bed sheets and a mattress. He was then flown to the United States and arraigned in this Court on August 19, 2019. His sojourn in the Estonian jail must have seemed like paradise compared to his now 15-month remand in the MCC, in that he speaks and understands hardly any English, has had no visitors aside from his lawyers, and, like everyone else, has been locked down almost 24-hours a day, with barely any showers, no recreation to speak of and mostly cold food, during the last approximately 9 months during the COVID pandemic. The pandemic also lead to his being marooned there for several months awaiting the opportunity for his (successful) safety-valve proffer and guilty plea, and now this chance to argue for his freedom.

The mitigation we seek finds substantial support in three legal principles that apply to his sentencing. We know the Court is aware of these principals, and we do not intend to argue them at any length given our previous submissions and the sentences this Court has given to Mr. Niftalijev's co-defendants. These three principals may be described in shorthand as "imperfect entrapment," "suffering as punishment" and "avoiding unwarranted sentencing disparities."

**Imperfect entrapment.** Notwithstanding the defendant's guilty plea in this case, the Court may still consider facts indicating entrapment in imposing sentence. *See, e.g., United States v. Bala*, 236 F.3d 87, 92 (2d Cir. 2000) ("we can find nothing in the guidelines to prohibit a district court from considering conduct by the government that does not give rise to an entrapment defense but that is nonetheless 'aggressive encouragement of wrongdoing'"). The Government conceded the applicability of this principle under Section 3553 in sentencing Veronjuk, a far more culpable co-defendant (June 30, 2020 Tr. at 15), and the Court indeed applied it, stating:

> At the same time, I do believe that in considering the nature and circumstances of the offense, under Section 3553(a), it is fully appropriate to consider the full role of law enforcement's inducement in assessing a defendant's culpability. And the fact is that the size and nature of this drug trafficking deal was driven in large part by the government, and there is some significance to the fact that this defendant did not have a fentanyl operation going before these meetings with law enforcement with the cooperating individual, but ended up acquiring the drugs by mail order.

(*Id.* at 35-36.)

**Suffering as punishment.** In *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001), the Second Circuit held *per curiam* that harsh pretrial conditions could be grounds for a downward sentencing departure. Thereafter, other courts in this Circuit made clear that such conditions were grounds for sentencing relief because they amounted to "enhanced punishment." *See, e.g.*, *United States v. Tomes*, 2005 WL 2087818 at*2 (S.D.N.Y. Aug. 30, 2005) (McKenna, J,) ("enhanced deprivations . . . and suffering" by the defendant who was held in pretrial detention in Colombia would produce a "magnitude of punishment effectively disproportionate"); *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004) (Marrero, J) (denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines").

Courts have recognized the suffering endured by defendants based on the harsh conditions while being detained during this pandemic and reduced sentences accordingly, and this Court has already recognized that this group of defendants was held in difficult conditions both in Estonia and in detention here, and considered such conditions in sentencing Veronjuk (June 30, 2020 Tr. at 36) and another co-defendant, Bokov (July 9, 2020 Tr. at 42). In the case of Mr. Niftalijev, the amount of his suffering was of a much greater degree and it began much earlier than his formal arrest in Estonia. It is clear, as the Government has essentially conceded, that his injuries were not self-inflicted (June 30, 2020 Tr. at 24), and that he was attacked by someone who intended to kill him. However, it matters little with regard to the concept of suffering as punishment how or when his case-related injuries were received, for courts have recognized the availability of sentencing relief for extreme suffering in the aftermath of events that occurred during of the commission of the crime, and with or without government participation. *See, e.g., United States v. Gamboa,* 543 F.2d 545 (5th Cir. 1976) (defendant severely injured by accidental explosion of his pipe bomb);

3

*United States v. Peterson*, 782 Fed. Appx. 231, 239, 2019 WL 3451050 (4thCir. 2019) (defendant injured by arresting officers); *United States v. Ehis*, 2009 WL 2413505 (E.D.N.Y. 2009) (defendant attacked in jail by other inmates).

**Avoiding unwarranted sentencing disparities.** This principal is enshrined in Section 3553(a)(6) and is clearly applicable here insofar as Mr. Niftalijev is far less culpable than Veronjuk, as the Government recognized, at the latter's sentencing. (*See* June 30, 2020 Tr. at 20.) While we do not know what position the Government will take on relative culpability *vis a vis* the co-defendant Litvintsuk, who was sentenced last month to "time served" by this Court, our view, which is supported by the evidence and other materials in our possession, is that Mr. Niftalijev is the least culpable of the defendants in this case. We respectfully refer the Court to our June 11, 2020 letter in which we discuss the February 18, 2018 Warsaw meeting, in which Veronjuk indicated to the CS at that early date his intention to get a "programmer" to troll the internet for the drugs, who turned out to be his long-time friend, Litvitsuk. Our letter further discusses the April 19, 2018 conversation with the CS in which Veronjuk and Litvintsuk relate their unsuccessful efforts to obtain the drugs. What happened in-between these dates, according to information provided to us by the Government in discovery, is that a meeting in was held a bathhouse in Tallinn in which Mr. Veronjuk introduced Litvintsuk to the CS as a computer expert with the ability to obtain the drugs. Notably, Mr. Niftalijev did not attend this meeting, and obviously never met with the CS after he was put in a coma. Veronjuk and Litvintsuk did meet with the CS, however, after the expendable Mr. Niftalijev was poisoned, and the purpose of this meeting was to fabricate what had happened to Mr. Niftalijev in order to maintain the CS's confidence in them, and engage in further planning to continue their relationship. Thus, we do not view this culpability ranking as a close call.

For the foregoing reasons, we respectfully submit that a sentence of "time served" is the appropriate sentence for Mr. Niftalijev.

Very truly yours,

*Bennett M. Epstein*

Bennett M. Epstein

cc: George Turner, Esq.

.

.