

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 18, 2020

**VIA ECF AND EMAIL**
The Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Nikolai Niftalijev*, 18 Cr. 678 (JPO)

Dear Judge Oetken:

    The defendant is scheduled to be sentenced on November 25, 2020, following his plea of guilty to conspiring to import into the United States more than 400 grams of fentanyl and more than 100 grams of carfentanil, a fentanyl analogue, in violation of Title 21, United States Code, Section 963. The defendant's United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, as stipulated in the defendant's plea agreement and calculated by the Probation Department, is 135 to 168 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons that follow, the Government respectfully submits that a substantial sentence of incarceration, below the Stipulated Guidelines Range, would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

**I.**     **Background**

    **A.**     **The Offense Conduct**

    For at least a decade, the Drug Enforcement Administration ("DEA") Special Operations Division's Bilateral Investigations Unit ("BIU") has partnered with foreign law enforcement to curtail the massive flow of synthetic opioids from Asia, through Europe, and into the United States. As the opioid epidemic continues to wage a devastating toll in the United States and elsewhere—causing more than 130 overdose deaths a day in the United States—and as drug traffickers use increasingly sophisticated cyber tools and encrypted applications to conceal their illicit activities, the DEA and other law enforcement agencies rely on investigative techniques such as sting operations to identify and infiltrate the supply and distribution chain, and disrupt those who would flood this country with deadly narcotics like fentanyl and its analogues.

    In 2017, the BIU and Estonian law enforcement began investigating Amid Magerramov and Jevgeni Bokov for their involvement in Estonian organized crime, drug trafficking, and money laundering. As described below, the investigation revealed that Magerramov led a team of criminals, including the defendant, who worked together to supply carfentanil in Europe for

distribution in the United States. Bokov, an experienced money launderer, agreed to illicitly wire the proceeds of narcotics sales through companies in Europe to banks in the United States.

In October 2017, a DEA confidential source (the "CS") met with Bokov and Magerramov over the course of two days in Tallinn, Estonia to discuss a potential narcotics trafficking and money laundering deal. (Presentence Investigation Report, dated Nov. 16, 2020 ("PSR"), ¶ 22). The CS told Bokov and Magerramov that he was a member of a Colombian drug cartel that trafficked drugs into the United States and needed assistance laundering the narcotics proceeds. (*Id.*). The parties exchanged contact information and agreed to meet again in the future to discuss a possible deal.[1]

Magerramov met with the CS again in Tallinn in January 2018. (*Id.* ¶¶ 23-25). During the meeting, the CS told Magerramov that his drug trafficking organization (the "DTO") was looking for a partner who could provide large quantities of fentanyl in Europe for transport to the United States. Magerramov confirmed that he knew "many people" who would be willing to provide the DTO with fentanyl, explained that fentanyl "is made for rhinoceroses," and confirmed that he "knew a lot about" fentanyl, and that when "[p]eople don't know the dose, [they] die." (*Id.* ¶ 23). As discussed below, one of the "many people" willing to help provide these lethal drugs for importation to the United States was the defendant.

The following month, the CS met with Magerramov, Voronjuk, and the defendant in Poland to discuss the fentanyl trafficking partnership, and the meeting was recorded. (*Id.* ¶ 26). Magerramov and Voronjuk had brought Niftalijev into the deal. Niftalijev had experience with street-level narcotics dealing in Tallinn, and knew Magerramov through Niftalijev's wife. Niftalijev expected to receive a portion of the profits from supplying the CS with large quantities of fentanyl. At the meeting, Niftalijev asked the CS how much fentanyl the DTO would require, and inquired about the DTO's plans for distributing the fentanyl that the defendants would provide. (*Id.* ¶ 26). The CS explained that the DTO trafficked between 350 and 400 kilograms of heroin each month, and wanted to mix the heroin with fentanyl to make it "more powerful." (*Id.*). The CS said that one kilogram of heroin sold for $65,000 in New York, but that the price would double when the kilograms were cut with fentanyl. The defendant replied: "I know . . . this is good." (Dkt. 77 at 3). When the CS asked how long it would take for the defendants to provide him with one kilogram of fentanyl, Niftalijev responded: "my country cooks all of this . . . . Laborator[y] is fixed up and fill[ed] with all this very strong stuff. . . . ." (*Id.* at 3-4). The CS then explained that, going forward, the DTO would purchase from the defendants three kilograms of fentanyl a month, which would sell for more than $65,000 per kilogram in the United States. During a side conversation in Russian, Niftalijev remarked to his co-conspirators: "Can you imagine . . . If we supply every month hundred and fifty. . . ." (*Id.* at 4).

---

[1] As reflected in the PSR, after a series of meetings with the CS over the course of several months, Bokov subsequently laundered nearly $300,000 in what he believed were drug proceeds from Europe to banks in New York City. (PSR ¶ 66).

As the meeting continued, the defendant and Magerramov confirmed that the product they would provide was "very strong," and that a user could overdose from a quantity of fentanyl equivalent to one grain of salt. Voronjuk told the CS that the fentanyl that the crew would provide was "very dangerous . . . . Very dangerous shit, this is big quality." (*Id.* ¶¶ 30-31). Voronjuk also explained that, because Estonian police had recently shut down fentanyl labs in Estonia, they would need to produce and provide the fentanyl through other means. (*Id.* ¶ 28). Niftalijev noted that "one hundred kilogram Fentanyl is very strong," but assured the CS that they would provide it to "mix" with "heroin[]." (Dkt. 77 at 4). Niftalijev confirmed he understood that the fentanyl-heroin mixture would be sold on the "street" in "America," and told the CS that the mixtures should be "fifty, fifty." (*Id.*). Niftalijev explained further that the defendants would provide the DTO with a sample of their product—"we are cooking all and I give you . . . and you tell me is good or no good"—and explained that, if the DTO was not satisfied with the quality of the sample, the defendants would employ a chemist to fix it. (*Id.*). During a side conversation in Russian, the defendants discussed how they would produce the fentanyl for the sample, during which Niftalijev demonstrated his familiarity with producing heroin-fentanyl mixtures. (*Id.* (Niftalijev: "It needs to be made very weak, otherwise, it will be fucked up")).

In March 2018, Magerramov and Voronjuk brought co-defendant Viktor Litvintsuk into the operation. The crew's leader, Magerramov, subsequently tasked Litvintsuk—a sophisticated online operator with a prior conviction for fraud and hacking in Germany—to obtain fentanyl over the Internet. Litvintsuk found a China-based supplier, and ordered gram-quantities of carfentanil—a pinprick of which is enough to kill a human being—through the supplier's website. The carfentanil was shipped to Europe, where Niftalijev and Voronjuk, both experienced drug dealers, were responsible for preparing the narcotics for distribution. Niftalijev and Voronjuk mixed the carfentanil with a cutting agent, brown sugar, to create kilograms of a powerful carfentanil mixture.

In parallel, in early March 2018, Magerramov and Voronjuk met with the CS again in Tallinn to discuss the crew providing a sample of fentanyl so the DTO could "test" the quality. (PSR ¶ 32). Voronjuk explained, during the recorded meeting, that the crew would deliver batches of three different strengths: "strong. . . very strong and medium," and reiterated that the drugs were "very dangerous," even in "small, small, small" amounts. (*Id.* ¶¶ 32-34). Magerramov told the CS that each of the samples would contain approximately 100 grams of fentanyl, and Voronjuk said that the CS would need to provide an up-front payment of approximately 20,000 euros. (*Id.* ¶ 34). The CS agreed to provide the payment in Estonia the following week, and the defendant and Magerramov told the CS that they would then deliver the samples to an associate of the CS in Denmark. (*Id.*).

Approximately one week later, Magerramov and Voronjuk met again with the CS over the course of two days. The CS provided the 20,000 euro payment, and Magerramov and Voronjuk confirmed that they would deliver the drug samples to the CS's associate within three to four weeks in Denmark. (*Id.* ¶¶ 35-36). The CS explained that the samples would be delivered to the United States, and that once the DTO confirmed that it was satisfied with the quality, the DTO would purchase additional quantities of fentanyl from the defendants every approximately six weeks. (*Id.*

¶ 36). Voronjuk and Magerramov indicated that they understood and agreed—that they were willing to continue providing fentanyl for distribution in the United States going forward.

On March 31, 2018, Magerramov, Voronjuk, Niftalijev, and Litvintsuk met with the CS in Tallinn for the purpose of coordinating the delivery of the fentanyl samples. They informed the CS that the crew would be ready to provide the CS with the three samples in approximately one week. Niftalijev assured the CS that they would be providing three 100-gram samples, but explained that they would not be ready for at least one week because the defendants were "running out of supplies." (Dkt. 77 at 6). The defendants asked the CS for more money to facilitate their production, and Niftalijev, in a conversation in Russian, urged his co-conspirators to "tell [the CS] that we don't need lots of money, just for a week. We've lived here [in Amsterdam] for a month already; at least money for this week. We are not asking for a lot of money." (*Id.*). The CS said that he would provide further payment after he received the samples and asked the defendants how long it would take them to start production of larger quantities of fentanyl. The defendant explained to Litvintsuk, one of whose roles was serving as an interpreter: "In two (2) days we can give him everything we have, but not the way he wants it, he wants that we will take everything and give him a lot and constantly. We will need to start and do everything again from the beginning. It's too much." (*Id.* at 6-7). The defendant nonetheless urged Litvintsuk to tell the CS that they would "talk about it later." (*Id.*). The CS told the defendants that, after he received the samples, he would order 30 more kilograms of fentanyl. When Voronjuk privately expressed concern (in Russian) about their ability to produce such a large quantity—"Can you imagine? We can't do this much in two (2) days."—and stressed that they "need[ed] a place" to produce the drugs, the defendant reassured him: "We'll rent it. We will take it in advance." (*Id.* at 7). Niftalijev then explained to the CS that it would take them time to produce 30 kilograms because "the materials come from two different places." (*Id.*) The parties discussed logistics for the delivery of the samples, and the CS explained that his associate would park a car at a location in Copenhagen, Denmark, which location the CS would relay to Magerramov. (*Id.*).

On May 9, 2018, after Magerramov and the CS exchanged a series of text messages to coordinate the fentanyl delivery, Magerramov, Voronjuk, and Niftalijev delivered the samples to the CS's associate in Copenhagen. (PSR ¶¶ 41-47). Niftalijev personally delivered the carfentanil, placing the lethal substances in the trunk of a particular vehicle in Copenhagen, as the defendants had agreed with the CS. After delivering the carfentanil, the defendant reconvened with Magerramov and Voronjuk at a nearby hotel. (*Id.* ¶ 45). The samples were packaged in three blue rubber gloves with five clear plastic bags containing carfentanil mixed with brown sugar, and totaled about 550 grams. (*Id.* ¶¶ 46-47). Consistent with Voronjuk's statements to the CS at the meeting discussed above, the bags were labeled with three different strengths of narcotic: one of the bags was labeled "I. Very Strong."; two of the bags were labeled "II. We think it's Better For you."; and two of the bags were labeled with the number "III." (*Id.* ¶ 460).

Magerramov continued to communicate with the CS by phone throughout May 2018 to confirm receipt of the samples and coordinate another, larger drug transaction, as agreed during the March 31, 2018 meeting. (*Id.* ¶¶ 48-51). On or about May 29, 2018, Niftalijev, Voronjuk, and an associate ("CC-1") traveled to a cabin outside Copenhagen to prepare the larger batch of carfentanil mixture for delivery to the CS. Niftalijev expressed frustration to Voronjuk that they

had been working to obtain and supply fentanyl to the CS for an extended period without receiving significant money in return. (*See* Dkt. 60-2 (Niftalijev Aff., dated Feb. 27, 2020) at 2-3). Niftalijev asserts that the last thing he remembers from the cabin is being physically attacked. (*Id.* at 3). He was later transported to a Danish hospital after campsite personnel found him unconscious. Medical records reflect that Niftalijev had bruises on his buttocks, and methamphetamine and cannabis in his system; his condition was serious, and he was placed into a medically-induced coma before ultimately recovering. The facts relating to the events at the campsite and Niftalijev's subsequent medical treatment are detailed in the Government's opposition to Niftalijev's severance motion. (*See* Dkt. 77 at 10-28). On May 30, 2018, Voronjuk and CC-1 delivered approximately 5.2 kilograms of carfentanil, cut with brown sugar, to the CS's associate's car in Copenhagen. (*Id.* ¶¶ 51-54). Niftalijev's co-defendants engaged in subsequent meetings with the CS, in which Niftalijev did not participate, to plan future shipments of carfentanil.[2]

### B. The Arrest, Extradition, and Guilty Plea

The defendant was arrested, along with Magerramov, Bokov, and Voronjuk in Estonia on September 4, 2018 (Litvintsuk was arrested the following day). (PSR ¶¶ 71-72). The defendant was extradited to this District on August 1, 2019; his extradition was delayed as compared to his co-defendants because of his medical condition described above, which necessitated continued treatment in Estonia prior to transport to the United States.

The defendant pled guilty, pursuant to a plea agreement, to Count One of the Indictment on October 26, 2020. (*Id.* ¶ 10). The parties stipulated in the plea agreement to a Guidelines range of 135 to 168 months' imprisonment (*i.e.*, the Stipulated Guidelines Range). (*Id.*). The Probation Department similarly calculates the defendant's Guidelines range to be 135 to 168 months' imprisonment. (PSR ¶ 116.) The parties and the Probation Department agree that the defendant is entitled to safety-valve relief from the otherwise applicable mandatory minimum sentence of ten years' imprisonment. *See* 18 U.S.C. § 3553(f). The defendant requests a sentence of time served (about 26 months). The Probation Department recommends a sentence of 60 months' imprisonment. To date, the Court has sentenced three of the four other defendants in this case: Bokov and Voronjuk each received a sentence of 33 months' imprisonment, and Litvintsuk received a sentence of time served, amounting to approximately 24 months'

---

[2] 

imprisonment. As explained below, the Government submits that the Court should impose a substantial sentence of incarceration below the Stipulated Guidelines Range.

**II.     Discussion**

A substantial sentence of incarceration is necessary to reflect the seriousness of the defendant's crimes, to afford just punishment, and to promote respect for the law. *See* 18 U.S.C. § 3553(a). The defendant and his co-conspirators supplied nearly six kilograms of carfentanil that they believed would be imported into the United States. They did so on the understanding that, if the CS's cartel approved of the quality of their drugs, they would partner with the cartel to traffic even more carfentanil into a country already ravaged by synthetic opioids. And, as is chillingly apparent from their recorded meetings with the CS, the defendant and his co-conspirators were well aware of the horrific, deadly consequences that could result from their crimes.

It bears emphasizing that, on average, nearly 130 people in the United States die of an opioid overdose every day.[3] Between 2015 and 2017, the opioid epidemic caused the average life expectancy in the United States to decline for the first time since the AIDS epidemic in the 1990s.[4] Although the overall drug overdose death rate has declined slightly in the last two years, the number of deaths caused by synthetic opioids such as fentanyl and fentanyl analogues continues to rise. The New York Times recently reported that "[i]n 2018, more than 31,000 deaths involving synthetic opioids (other than methadone) occurred in the United States, which is more deaths than from any other type of opioid. Synthetic opioid-involved death rates increased by 10% from 2017 to 2018 and accounted for 67% of opioid-involved deaths in 2018." *Id.*

Carfentanil, an analogue of fentanyl, is among the deadliest drugs in the world. It is 100 times more potent than fentanyl and 1,000 times more powerful than heroin.[5] Typically used to sedate large animals like elephants, just .02 milligrams, or "hardly more than a speck of dust" could cause someone to overdose and die. Richard A. Friedman, *Ordering Five Million Deaths Online*, N.Y. TIMES, Apr. 4, 2018, *available at* https://www.nytimes.com/2018/04/04/opinion/carfentanil-fentanyl-opioid-crisis.html. One kilogram of carfentanil contains approximately 50 million fatal doses. Carfentanil is so potent that veterinarians wear face masks and gloves when they administer it to avoid exposure (*id.*), and the

---

[3] Centers for Disease Control and Prevention, America's Drug Overdose Epidemic: Data to Action, *available at* https://www.cdc.gov/injury/features/prescription-drug-overdose/index.html.

[4] Sabrina Tavernise and Abby Goodnough, *American Life Expectancy Rises for First Time in Four Years*, N.Y. TIMES, Jan. 30, 2020, *available at* https://www.nytimes.com/2020/01/30/us/us-life-expectancy.html.

[5] United States Department of Justice, Drug Enforcement Administration, Officer Safety Alert, *available at* https://www.justice.gov/usao-edky/file/898991/download. Indeed, the DEA generally does not allow field testing of drugs suspected to contain fentanyl or fentanyl analogues because of the risks it could pose to agents in the field.

DEA has instituted emergency protocols for agents who may have been exposed to it when making arrests and seizures.[6]

      Notwithstanding his awareness of the potentially devastating consequences of his actions, Niftalijev readily joined Magerramov's criminal venture, and worked over the course of several months to supply a large volume of a lethal substance to the CS for importation into the United States. Niftalijev, who was involved in, and had been arrested on multiple occasions for, street-level dealing in Estonia, was eager to profit off the deal. Niftalijev not only agreed during multiple recorded meetings to work together with his co-defendants to supply carfentanil for importation into the United States, he helped to prepare, and personally delivered, over 500 grams of a carfentanil mixture—a tiny dose of which is enough to kill. The defendant was instrumental in preparing and delivering carfentanil to the CS, and as described above, he expressed his eagerness to complete the deal during meetings with the CS, even reassuring Voronjuk that the defendants would be able to supply a large quantity. He also demonstrated his experience in dealing with narcotics during discussions regarding how to mix the carfentanil. In terms of relative culpability, the Government views the defendant as somewhat more culpable than Litvintsuk—who, unlike the defendant, was not an experienced drug dealer and acted in large part as a translator for his co-conspirators—and somewhat less culpable than Voronjuk, who outranked Niftalijev in the conspiracy and gave him instructions. The fact that the defendant, after months of working to supply fentanyl, expressed frustration about the progress of the deal—and suggested simply selling the fentanyl on the streets of Tallinn—does not meaningfully mitigate and instead only underscores the defendant's commitment to profiting off distributing fentanyl, whether internationally or in his native country. A substantial sentence is appropriate to reflect the seriousness of the defendant's criminal conduct.

---

[6] Centers for Disease Control and Prevention, National Institute on Drug Abuse, Overdose Death Rates, *available at* https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.

Accordingly, the Government respectfully submits that a substantial sentence of incarceration below the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to achieve the objectives of sentencing.

Respectfully submitted,

AUDREY STRAUSS  
Acting United States Attorney

By:          /s/           
George D. Turner / Kyle A. Wirshba  
Assistant United States Attorneys  
(212) 637-2562 / 2493

cc: Bennett Epstein, Esq.  
    Sarah Sacks, Esq.